Rosemarie TOFANO, as administrator ad prosequendum and General Administrator of the Estate of Scott Tofano, Deceased, and Rosemarie Tofano, individually, Plaintiff,

v.

Christopher REIDEL, David Stitz, Michael Devine, and Town of Ramsey, Defendants.

No. Civ.A. 97–3680(MTB).

United States District Court,
D. New Jersey.

Aug. 11, 1999.

Stephen H. Fields, Stephen H. Fields & Associates, New York City, for plaintiff.

Ian C. Doris, Harwood Lloyd, L.L.C., Hackensack, New Jersey, for defendant Christopher Riedel.

Dennis Calo, Calo Agostino, P.C., Hackensack, New Jersey, for defendant David Stitz.

Robert J. Maloof, Hein, Smith, Berezin, Maloof, Spinella & Rogers, L.L.C, Hackensack, New Jersey, for defendant Michael Devine.

Alexander H. Carver, III, Carver & Mancinelli, Westwood, New Jersey, for defendant Town of Ransey.

## OPINION

BARRY, District Judge.

This case arises from the death of Scott Tofano ("Tofano") on July 24, 1996 following an altercation with three police officers, defendants Christopher Reidel ("Reidel"), David Stitz ("Stitz"), and Michael Devine ("Devine")(collectively as "officers"). Tofano's wife Rosemarie Tofano, as administrator of Tofano's estate and on her own behalf ("plaintiff"), brings this action alleging that the officers violated Tofano's Fourth and Fourteenth Amendment rights as well as New Jersey common law by their actions on July 24, 1996. In addition, plaintiff contends that the Borough of Ramsey (incorrectly named as the Town of Ramsey) ("Ramsey") failed to properly train its police officers and maintained policies or customs exhibiting a deliberate indifference to the constitutional rights of individuals in the Borough, indifference which caused Tofano's constitutional rights to be violated. The officers and Ramsey now move for summary judgment. Reidel and Devine also move to exclude the testimony of Louis S. Roh, M.D. ("Dr. Roh") as unreliable. While the testimony of Dr. Roh will not be excluded, the motions for summary judgment will be granted.

### I. Background

The facts of this case are largely undisputed.[1] At approximately 2:11 am on July 24, 1996, Officer Devine was on duty and received a radio dispatch regarding a man wearing shorts but no shirt, who was yelling and running around in the parking lot of the Timber Valley Condominiums. *See* Devine Cert. ¶ 3. Devine drove to the

---

**1.** This court will draw from the statements of the officers and the medical evidence presented in detailing the undisputed facts. In her counterstatement of material facts in dispute ("Pl. Counter Stmt."), plaintiff conclusorily states, without presenting any evidence, that numerous facts regarding Tofano's altercation with the officers are in dispute. This court will note these when detailing the facts but will not consider assertions without evidential support as creating genuine issues of disputed fact. *See* Fed.R.Civ.P. 56(e)("an adverse par-

ty may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). This court recognizes, and sympathizes with, the difficulty this requirement places on plaintiff given that her husband is deceased and, aside from the officers, there were no witnesses to the altercation. It is, nonetheless, a requirement she must satisfy.

parking lot and, upon arrival, Tofano—a thirty-four year old, 6' 2" white male weighing 211 pounds [2] and with a "very muscular build"—ran toward Devine's squad car. *See id.* ¶ 4; Exh. D [3] at 2. Tofano was wearing black boxer shorts and one sock, and was carrying, among other things, clothing, a manila envelope, a wallet, a green folder or book and two rocks. *See* Devine Cert. ¶ 4; Devine Dep., Exh. C at 17. He was sweating profusely and speaking in an excited manner. *See* Devine Cert. ¶ 4; Devine Dep., Exh. C at 18.

Tofano asked Devine to kick in the door to an apartment in building seven because there were about twenty people in there trying to frame him. *See* Devine Cert. ¶ 5. Tofano said that the people in the apartment had kidnapped his dog and he wanted to rescue it. *See id.* Devine tried to calm Tofano down and eventually got him to put down the rocks and hand him his wallet. *See id.* ¶ 6.

Officer Stitz then arrived on the scene. He spoke with Tofano while Devine threw the rocks out of Tofano's reach and toward some bushes. *See id.* ¶ 7. Devine also looked through Tofano's wallet for identification and to ascertain whether he was under the care of a doctor. *See id.*

Stitz and Devine engaged in small talk with Tofano in an attempt to calm him down but were unsuccessful as Tofano continued to talk about the people he was seeing all around him. *See* Devine Cert. ¶ 9; Devine Dep., Exh. C at 19. In a loud and boisterous manner, Tofano stated that there were people on the roof of building seven, in the patrol car, and standing near them, including a man wearing white standing behind Devine with his hand on Devine's shoulder. *See* Devine Cert. ¶ 8; Stitz Cert., Exh. J ¶ 4. No one was present aside from Stitz, Devine and Tofano. *See* Stitz Cert.Exh. J ¶ 4.[4] Tofano also stated that all of the cars in the parking lot were stolen by people in building seven. *See* Devine Cert. ¶ 8.

While Sergeant Reidel was on patrol that night, he heard over the radio that two officers had been dispatched to investigate a noise disturbance and went over to see if he could be of assistance. *See* Reidel Dep., Exh. A at 48. Upon Reidel's arrival, Tofano was still excited and was talking about the people who were out to get him. *See id.* at 49. Stitz updated Reidel as to Tofano's behavior and advised Reidel that Tofano seemed to be in need of psychiatric screening and evaluation from 262–HELP, a County run mental health division affiliated with Bergen Pines Hospital. *See* Reidel Dep., Exh. A at 49; Stitz Cert., Exh. J ¶ 5. It was determined that Tofano would be taken into custody for disorderly conduct and given a mental status evaluation. *See* Stitz Cert., Exh. J ¶ 6. In an extremely agitated state, Tofano continued to talk about people kidnapping his dog and insisted that the officers go to his apartment to view the evidence he had collected. *See* Devine Cert., ¶ 11; Reidel Dep., Exh. A at 53. The officers told Tofano that they were going to try to help him and tried to convince him to get into the patrol car. *See* Stitz Cert., Exh. J ¶ 6; Devine Cert. ¶ 11; Reidel Dep., Exh. A at

---

**2.** Plaintiff states that "Tofano weighed closer to 180 pounds, not the over 200 alleged by the defendants." *See* Pl. Counter Stmt. ¶ 3. This assertion, based only on plaintiff's opinion as to what Tofano weighed, is directly contradicted by an autopsy report which found that he weighed 211 pounds. *See* Exh. D at 2. Indeed, the autopsy report submitted by the doctor retained by plaintiff, Dr. Roh, estimated Tofano's weight to be 230 pounds. *See* Exh. B at 1.

**3.** Defendants have submitted two volumes of Joint Exhibits which will be referred to throughout the opinion.

**4.** Plaintiff states that it is disputed whether Tofano was experiencing a visual hallucination when the officers approached him. *See* Pl. Counter Stmt. ¶ 5. Plaintiff's conclusory assertion—based upon her deposition testimony that Tofano historically "only had auditory hallucinations, not visible[,]" Tofano Dep., Exh. L at 21—does not create a disputed fact as to what occurred on the night in question.

56. Tofano refused and grabbed Stitz's arm, dragging him through the parking lot. *See* Devine Cert., ¶ 12; Reidel Dep., Exh. A at 57; Stitz Cert., Exh. J ¶ 7.[5]

Stitz placed one handcuff on Tofano's right wrist, and informed him that he was under arrest for disorderly conduct. Stitz was unable, however, to attach the second handcuff to Tofano's left wrist. *See* Stitz Cert., Exh. J ¶ 7; Devine Cert. ¶ 12.[6] Reidel grabbed Tofano's left arm but Tofano broke free and swung his right arm at Reidel. *See* Devine Cert. ¶ 13; Reidel Dep., Exh. A at 77. Devine rushed in to help and Tofano again swung his right arm, slashing Devine's neck with the handcuff, and creating a cut that later required five stitches. *See* Devine Cert. ¶¶ 13, 20; Reidel Dep., Exh. A at 77. Tofano then started to run and Reidel tackled him from behind. *See* Reidel Dep., Exh. A at 77. After Tofano threw Reidel off him, Reidel informed the other officers that he was going to use pepper spray to try to subdue Tofano. *See id.* at 78. Reidel sprayed Tofano in the face and frontal area with the pepper spray but it had no effect on him. *See id.* at 78–79. Unfortunately, Stitz was also hit by the pepper spray and was temporarily incapacitated. *See id.* at 84; Devine Cert. ¶ 15. Tofano then threw Stitz into the patrol car, with Stitz hitting his head and falling to the ground. *See* Stitz Cert., Exh. J ¶ 8; Reidel Dep., Exh. A at 85; Devine Cert. ¶ 16.

Having broken free of everyone, Tofano ran into the stairwell of building seven and up a couple of stairs. *See* Devine Cert. ¶ 16. Reidel pursued him, concerned that Tofano was headed for the roof. *See* Reidel Dep., Exh. A at 85–86. While grabbing Tofano around the waist, Reidel lost control of the pepper spray canister. *See* Reidel Dep., Exh. A at 86. Tofano grabbed the canister and aimed it at Devine. *See* Devine Cert. ¶ 16. Devine was able to wrestle the canister out of Tofano's hand but during the struggle, they fell backwards two steps down onto the landing· and onto Reidel. *See* Devine Cert. ¶¶ 16, 17; Reidel Dep., Exh. A at 86–87.

Tofano continued to thrash about and tried to get up as the officers attempted to keep him on the ground. *See* Devine Cert. ¶ 17. Reidel held onto Tofano's arm and Tofano's head was on Reidel's left arm. *See* Reidel Dep., Exh. A at 87; Devine Cert. ¶ 17. Devine was positioned across the area of Tofano's buttocks. *See* Devine Cert. ¶ 17. Tofano continually kicked Devine until Stitz rejoined the group and managed to secure Tofano's legs. *See* Devine Cert. ¶ 17.[7]

Although Reidel and Devine tried to convince Tofano to stop struggling and relax, Tofano continued to yell and thrash about while Stitz attempted to radio for back-up. *See* Reidel Dep., .Exh. A at 88; Devine. Cert. ¶ 17.[8] Reidel was able to get

---

5. Plaintiff's bare assertion that "Tofano did not drag Stitz by the arm after being handcuffed[,]" Pl. Counter Stmt. ¶ 7, without personal knowledge or any evidential support, does not create a disputed issue of fact.

6. This court rejects out of hand plaintiff's contention that the alleged crimes committed by Tofano, including disorderly conduct, assault, and resisting arrest, "are in dispute." Pl. Counter Stmt. ¶ 8. The only support provided for this contention is that "[n]o adjudication was ever made regarding any alleged offenses committed by Scott Tofano on the date of his murder." *Id.* Tofano's death plainly obviated the need to file any formal charges against him.

7. Devine believes that Stitz kept Tofano's ankles together with a Velcro band, *see* Devine Dep., Exh. C at 35,· while Reidel believes that there were no leg restraints placed on Tofano. *See* Reidel Dep., Exh. A at 95. Plaintiff did not depose Stitz and Stitz does not mention a Velcro band in his certification. This does not pose a material issue of fact, however, as neither plaintiff nor her expert witness James Pickering contend that use of a Velcro band would be any more unreasonable or excessive than simply holding Tofano's legs down.

8. Plaintiff's bald contention that "Tofano did not struggle as he was being arrested[,]" Pl. Counter Stmt. ¶ 9, does not create an issue of fact as it is not based upon personal knowledge and is wholly unsubstantiated.

his portable radio out of his holder and called for assistance from the Mahwah Police Department. *See* Reidel Dep., Exh. A at 88–89. Tofano continued to struggle and move about while the officers tried to maneuver his left wrist into the handcuff. *See* Reidel Dep., Exh. A at 93–94.[9]

Tofano then stopped struggling and Devine was able to cuff Tofano's left wrist. *See* Devine Cert. ¶ 18. Once he was handcuffed, the officers rolled Tofano onto his back and noticed that he did not appear to be breathing. *See id.* ¶ 18. Devine ran to the patrol car for oxygen equipment. *See id.* ¶ 18. Tofano had a strong pulse at that time and Stitz, a licensed trained paramedic, immediately began rescue breathing. *See* Reidel Dep., Exh. A at 96–98; Devine Cert. ¶ 18; Stitz Cert., Exh. J ¶ 12. Reidel called for an ambulance and paramedic units. *See* Reidel Dep., Exh. A at 98. Devine applied a heart defibrillator unit and Stitz began cardiopulmonary resuscitation. *See* Stitz Cert., Exh. J ¶ 13. The Mahwah police officers arrived and assisted in the efforts to resuscitate Tofano. *See* Stitz Cert., Exh. J ¶ 12. Ambulance and paramedic personnel also arrived and ultimately transported Tofano to Good Samaritan Hospital where he was pronounced dead at 3:31 am. *See* Reidel Dep., Exh. A at 100–102; Exh. D at 1.

Stitz estimated that less than ten minutes elapsed between the time he arrived on the scene and the time the Mahwah officers arrived. *See* Stitz Cert., Exh. J ¶ 15. He stated that the physical confrontation with Tofano lasted less than two minutes and that, in addition to Devine's neck injury, Stitz's shoulder was separated during the incident and Reidel injured his knee. *See id.*[10]

Frederick T. Zugibe, M.D., Chief Medical Examiner in Rockland County, N.Y. ("Dr. Zugibe"), performed an autopsy on that same date and concluded that the cause of death was "[p]ositional asphyxia due to respiratory compromise in a person with toxic levels of cocaine and a congenital heart defect during police restraint." Exh. D at 6. The toxicology report submitted by Jesse H. Bidanset, Ph.D., DABFT, noted that the cocaine levels present in Tofano's blood, urine, brain, and internal organs "[were] within the ranges reported for cocaine fatalities." Exh. E at 1. In addition, Dr. Zugibe submitted a letter to a prosecutor in Bergen County explaining that:

> The reconstruction of the mechanism of death appears to be due to a fatal arrhythmia caused by an increase in the decedent's oxygen requirements with an inappropriate oxygen delivery resulting from three major events which rendered him susceptible to the fatal cardiac arrhythmia; 1. an increase in oxygen demands caused by catecholarnine stress on the heart due to cocaine toxicity, 2. an increase in oxygen demands caused by hyperactivity during police attempts at restraint and 3. a compromise of respiratory movements during restraint while holding him down in a prone position. This scenario may have been further aggravated by a congenital heart defect (hypoplastic coronary artery disease) detected at autopsy which can render such a person susceptible to a fatal arrhythmia during increased states of physical activity.

Exh. F. The letter also stated that "death due to cocaine toxicity, *per se* cannot be fully excluded." *Id.*

The following day, plaintiff retained Dr. Roh to perform another autopsy. *See* Exh. B at 1. After his examination of

---

9. Plaintiff's assertion that "[t]he officers did not hold on to Tofano merely to gain control of him[,]" Pl. Counter Stmt. ¶ 11, does not create an issue of fact because no evidentiary support is provided.

10. Without evidentiary support, this court cannot consider plaintiff's bald assertion that "[t]he interaction between Tofano and the defendants lasted much longer than 10 minutes, although the precise length of time is incapable of being determined on this record." Pl. Counter Stmt. ¶ 12.

Tofano's body, Dr. Roh stated that traumatic findings associated with asphyxiation such as "petechial hemorrhages in conjunctivae of eyes (small pin point hemorrhages in inner lining of eyelids), contusion of [the] mucosa of lip (bruise of inner lining of lip due to compression against the teeth), abrasion of skin of neck (scratch due to pressure on the neck), [and] hemorrhages of internal structure of the neck[,]" led him to conclude that Tofano "died as a result of copression [sic] to his mouth and neck." Exh. B at 6. He further opined that "[t]hree officers on his back while he was on prone position contributed to his asphyxial death." *Id.*

On June 24, 1997, plaintiff filed an eight-count complaint in this court against the officers and Ramsey alleging constitutional violations under 42 U.S.C. § 1983 (Counts One, Two, Five, Six, and Seven) as well as common law claims of assault and battery (Counts Three and Four) and negligence (Count Eight). As noted above, defendants now move for summary judgment on all counts and Reidel and Devine move to exclude Dr. Roh's testimony.[11]

## II. DISCUSSION

### A. Dr. Roh's Report

Before moving to the summary judgment motions, this court will first address the preliminary issue of whether Dr. Roh's expert opinion should be excluded. Reidel and Devine contend that Dr. Roh's expert opinion must be excluded because it is unreliable. This court does not agree.

■ The Federal Rules of Evidence, as a whole, embrace a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 956 (3d Cir. 1990). This generous policy is embraced by the rules pertaining to expert evidence as well. *See Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 780 (3d Cir.1996). Together, Rules 702 and 104(a) govern the admission of expert testimony. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. This section sets forth three fundamental requirements, namely:

> (1) the proffered witness must qualify as an expert by knowledge, skill, experience, training or education; (2) the expert must testify to scientific, technical, or other specialized knowledge; and (3) the expert's testimony must assist the trier of fact.

*Lauria v. National Railroad Passenger Corp.*, 145 F.3d 593, 597 (3d Cir.1998). Under Rule 104(a), the court must make preliminary determinations regarding whether the proposed expert is qualified and whether the evidence is admissible so as to assure that the testimony meets the minimum requirements of reliability and relevance. *See Holbrook*, 80 F.3d at 781.

■ Reidel and Devine do not dispute that Dr. Roh, the Deputy Chief Medical Examiner of Westchester County, New York, *see* Roh Dep. at 9, qualifies as an expert in pathology. Nor do they dispute that Dr. Roh has submitted testimony regarding matters requiring scientific, technical or specialized knowledge. Reidel and Devine instead contend that Dr. Roh's opinion should be excluded because that opinion is unreliable. They contend, more

---

11. Reidel mentions in his brief that he is also moving to dismiss Defense Technology's Third Party Complaint and all cross-claims asserted against him. *See* Reidel Br. at 2. On July 7, 1998, plaintiff filed a second complaint, Civ.A. 98–cv–3209, against Defense Technology Corporation of America, the manufacturer of the pepper spray used on Tofano. Both plaintiff's complaint and Defense Technology's Third Party Complaint, along with all cross-claims, were voluntarily dismissed and the case was closed on May 24, 1999.

specifically, that his opinion is result-oriented rather than based upon the facts because he did not follow proper forensic pathology protocol, including investigating the scene, reviewing police reports, or interviewing the victim's wife; based his conclusions only on a viewing of the body itself; and failed to adequately consider the possibility that Tofano died solely due to a cocaine overdose.

The Court of Appeals for the Third Circuit has set forth the lens through which to view reliability:

> The reliability requirement ... should not be applied too strictly. Helpfulness to the trier of fact remains the ultimate touchstone of admissibility. If the expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently reliable. A determination that the expert has good grounds assures that the expert's opinions are based on science rather than 'subjective belief or unsupported speculation.'

*Holbrook*, 80 F.3d at 784 (citing to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

Without commenting on the weight to be afforded Dr. Roh's testimony, contrary to Devine and Reidel's contentions there is no indication that Dr. Roh's conclusions, even if based solely on an examination of Tofano's body, were based upon his subjective belief or unsupported speculation rather than science. Dr. Roh, a licensed medical doctor who is board certified in anatomic pathology, clinical pathology and forensic pathology, performed what no one disputes was a standard autopsy. Although he did not investigate the scene or interview Ms. Tofano or the officers, his conclusions were primarily based upon the physical evidence, namely the location of various hemorrhages, contusions and abrasions, rather than upon unsupported speculation. *See* Exh. B at 6. In addition, while Dr. Roh concluded that Tofano died as a result of compression to his mouth and neck, he did acknowledge the toxic level of cocaine in Tofano's blood and urine. *See id.* Indeed, during his deposition Dr. Roh admitted that the toxic level of cocaine in Tofano's system alone "could" have caused Tofano's death. Roh Dep. at 24.

The argument that Dr. Roh's conclusions are suspect because he was not fully aware of the circumstances surrounding Tofano's death relates to the weight that should be afforded to Dr. Roh's opinion, not to whether it should be excluded altogether. For example, given Dr. Roh's statement that "[t]hree officers on [Tofano's] back while he was on prone position contributed to his asphyxial death[,]" Exh. B at 6, when there is no evidence that there *were* three officers on Tofano's "back," may cause one to question the weight to be given to Dr. Roh's interpretation of the physical evidence. Because the standard for reliability and fitness is "not that high," *Lauria*, 145 F.3d at 600 (quotation omitted), however, it cannot be said that his opinion is so unreliable and unhelpful to the trier of fact that it should be barred completely.

Devine and Reidel also argue that Dr. Roh's opinion should be excluded because plaintiff implicitly rejected that opinion when her expert witness as to liability, James Pickering, did not mention it but, rather, referred to the conclusions from the autopsy that Dr. Zugibe performed. This argument will be rejected out of hand. That Pickering chose to refer to Dr. Zugibe's conclusions does not necessarily mean that he, or the plaintiff, rejected those of Dr. Roh. Indeed, it may have been thought that by referring to the autopsy submitted by defendants as opposed to that submitted by plaintiff, Pickering's conclusions would appear more objective and, thus, more credible.

Based upon the foregoing, this court will not exclude Dr. Roh's expert opinion and will move now to the motions for summary judgment.

### B. Summary Judgment Motions

Summary judgment may be granted if, after consideration of such items as depositions, affidavits or certifications, and after viewing the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 n. 3 (3d Cir.1994).

Although each officer's arguments differ slightly, the officers essentially argue that plaintiff's § 1983 claims must fail because their behavior was objectively reasonable and they are entitled to qualified immunity. They also argue that they are immune from suit on plaintiff's state law claims under the New Jersey Tort Claims Act. Ramsey sets forth numerous arguments as to why it is entitled to summary judgment both on plaintiff's § 1983 claims and the state law claims. This court will first address the officers' motions and then move to the motion filed by Ramsey.

### 1. § 1983 Claims Against the Officers

■ Section 1983 of Title 42 does not create substantive rights but is a vehicle by which to remedy violations of federal law. To establish a claim under § 1983, a plaintiff must show that a person acting under color of state law deprived him or her of a federal right. *See Groman v.*

*Township of Manalapan*, 47 F.3d 628, 633 (3d Cir.1995).

Plaintiff claims, under § 1983, that the officers violated Tofano's Fourth and Fourteenth Amendment rights. *See* Compl. ¶ 1. Specifically, plaintiff claims that the officers used excessive force and unreasonably seized Tofano. *See id.* ¶ 2.[12]

The officers assert that their actions were objectively reasonable and, hence, not violative of the Fourth Amendment and that they are entitled to qualified immunity. Because the question of qualified immunity entails determining the "contours of the constitutional right at issue[,]" *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir.1995), the analysis seems to "dovetail[ ] almost precisely with the substantive inquiry" under § 1983. Thus, this court will first address the officers' assertions of qualified immunity.

■ Qualified immunity is an affirmative defense to § 1983 claims. *See Wilson*, 52 F.3d at 1552. Although it is acknowledged that "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees" when government officials abuse their power, *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted), it is also clear that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their

---

**12.** In her complaint, plaintiff asserts that the officers failed to provide timely and appropriate medical treatment to Tofano, presumably in violation of the Fourteenth Amendment. *See* Compl. ¶ 52. This court can dispose of this allegation at this juncture. Assuming that they had a duty to do so, there is absolutely no evidence that the officers provided inadequate medical care. It is undisputed that, immediately upon noticing that Tofano did not appear to be breathing, the officers— one of whom was a licensed paramedic— called an ambulance and paramedics, checked Tofano's vital signs, began rescue breathing, and utilized oxygen equipment. When Tofano's pulse became weaker, the offi-

cers applied a heart defibrillator unit and performed cardiopulmonary resuscitation. *See* Reidel Aff., Exh. I ¶¶ 21–23; Stitz Cert., Exh. J ¶¶ 10–14. Plaintiff has pointed to nothing that would indicate inadequate medical assistance and, indeed, her expert witness, Pickering, testified that the officers' attempts to render medical assistance were not deficient. *See* Pickering Dep. at 83. Thus, the remainder of this court's opinion will deal with plaintiff's Fourth Amendment excessive force claim, especially in light of her assertion that "[t]he gravamen of the complaint against the individual police officers is that they used excessive force in their attempt to arrest Tofano." Pl.Br. at 4.

duties." *Id.* The doctrine of qualified immunity attempts to strike a balance between these competing interests. *See id.; Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995) (noting qualified immunity's attempt to accommodate important competing interests). Its purpose is "to shield public officers 'from undue interference with their duties and from potentially disabling threats of liability.'" *Wilson,* 52 F.3d at 1552 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

■■ To this effect, government officials, performing discretionary functions, are afforded qualified immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In other words, stressing the objective rather than subjective nature of the test, the Supreme Court has held that government officials are entitled to qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034. It is essentially a two part test.[13] First, a court must determine whether a plaintiff has alleged conduct that violated a clearly established constitutional or statutory right. *See Showers v. Spangler,* 182 F.3d 165, 171 (3d Cir.1999). Even if a violation of a clearly established constitutional or statutory right is found, however, the official may still be entitled to qualified immunity if, in light of the circumstances and what was known to the officers at the time, a reasonable officer could have believed that his or her conduct was lawful. *See Good v. Dauphin County Social Services for Children and Youth,* 891 F.2d 1087, 1092 (3d Cir. 1989). This test recognizes that it is inevitable that government officials may, in some cases, reasonably but mistakenly conclude that their actions comport with federal law. *See Orsatti,* 71 F.3d at 483. Indeed, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citation omitted).

■ Before applying the test in this case, it is important to note that qualified immunity, even though it entails questions of reasonableness, is to be decided by the court if there are no material issues of fact in dispute. *See Sharrar v. Felsing,* 128 F.3d 810, 828 (3d Cir.1997) (stating that "in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of 'clearly established law' that is for the court but also whether the actions of the officers were objectively reasonable. Only if the historical facts material to the latter issue are in dispute ... will there be an issue for the jury."); *Orsatti,* 71 F.3d at 483 (same); *Wiers v. Barnes,* 925 F.Supp. 1079, 1086 (D.Del. 1996) (explaining that when material facts are not in dispute, "[w]hether qualified immunity exists is a question of law to be determined by the Court"). Because qualified immunity is immunity from suit, and not simply from trial, it should be decided

---

**13.** The oft-quoted test for qualified immunity set forth in *Harlow* and explained more fully in *Anderson* sounds deceptively easy to apply. However, although all courts evaluate the particular cases before them under the general standards enunciated in *Harlow* and *Anderson,* there is no consensus on the analytical approach to be utilized when addressing a qualified immunity question. Indeed, on June 29, 1999, the Court of Appeals for the Third Circuit issued two opinions dealing with qualified immunity, one stating that the inquiry entailed a two part test, *see Showers v. Spangler,* 182 F.3d 165, 171 (3d Cir.1999); and the other deeming it a three part inquiry. *See Rouse v. Plantier,* 182 F.3d 192, 196-97 (3d Cir.1999). This court will draw from the caselaw in an attempt to present a coherent, and analytically sound, analysis of qualified immunity in the manner which best addresses the parties' arguments.

"at the earliest possible stage of the litigation." *Orsatti*, 71 F.3d at 483. Indeed, the Supreme Court has specifically stated that immunity should not be routinely placed in the hands of the jury and "ordinarily should be decided by the court long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. 534.

With this framework in mind, this court will first address whether plaintiff has alleged a violation of a clearly established constitutional right. To begin, there is no question, and Reidel admits, that Tofano possessed a clearly established right to be free from unreasonable seizure and excessive force. *See* Reidel Br. at 12. Moreover, at the time of the incident, the contours of the law were clear; namely, "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Explaining that the standard was one of objective reasonableness, the Court directed that attention be paid to, *inter alia*, the severity of the crime at issue, whether the suspect appeared to be a threat to the officers or others, and whether he or she was actively resisting or evading arrest. *Id.* at 396, 109 S.Ct. 1865.

Devine submits that the law surrounding excessive force is not "clearly established" because, under the objective reasonableness test of *Graham*, what constitutes excessive force is fact-specific and "not capable of precise definition or mechanical application." Devine Br. at 29 (quoting *Graham*, 490 U.S. at 386, 109 S.Ct. 1865). Thus, because this standard does not provide a bright line test against which officers may judge their conduct, Devine contends that he is entitled to immunity.

Simply because the test for excessive force is fact-dependent, however, does not mean that it is not clearly established and, indeed, numerous courts have held that the right to be free from excessive force, as defined by the reasonableness test of *Graham*, is clearly established. *See Wilson*, 52 F.3d at 1552 (stating that "[t]his court has held the reasonableness standard is 'clearly established' for purposes of section 1983 actions"); *Lloyd v. Jefferson*, 53 F.Supp.2d 643, 679 (D.Del. 1999) (holding that "[i]ndeed, there can be no doubt that [the individual] possessed a clearly established right to be free from unreasonable seizure and excessive force[ ]" and at the time of the incident "it was clearly established Third Circuit law that the objective reasonableness standard be applied to conduct allegedly violative of the Fourth Amendment"); *Wiers*, 925 F.Supp. at 1087 (stating that the law in the area of excessive force, namely objective reasonableness, is clearly established in the Third Circuit). To accept Devine's argument that the right to be free from excessive force can never be clearly established because there is not a bright line test would result in absolute immunity for all government officials in cases of excessive force. That simply cannot not be the case.

Having found the right to be free from excessive force and unreasonable seizure to be clearly established, the next question is whether plaintiff has alleged a *violation* of this right. As stated previously, whether conduct constitutes excessive force or an unreasonable seizure is determined under an objective reasonableness test, without regard to underlying intent or motivation. *See Graham*, 490 U.S. at 395–96, 109 S.Ct. 1865.

Determining the reasonableness of force or a seizure requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted). It must be remembered that "police officers are often forced to make split-second judgments—in cir-

cumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Thus, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." *Id.* at 396.

■■■ With this in mind, it is clear to this court that, under the objective reasonableness standard, the officers' conduct in this case did not constitute a violation of the Fourth Amendment and, therefore, that they are entitled to qualified immunity.[14]

The undisputed facts of this case lead inexorably to the conclusion that the officers' conduct was not unreasonable. For purposes of analysis, there are essentially four stages involved in the incident in question: one, the officers' initial interaction with Tofano; two, the decision to take him into custody, including handcuffing him; three, spraying him with pepper spray and later wrestling the spray from him; and, four, holding him in a prone position on the ground. Considering each of the stages, it is clear that there was no Fourth Amendment violation.

No one disputes, and this court so finds, that the officers' behavior when they first encountered Tofano was reasonable. In response to a noise complaint in the middle of the night, the officers were faced with a 6′ 2″, over 200–pound, very muscular man who was half-naked, holding rocks and raving about people who kidnapped his dog and were out to get him. When con-fronted with Tofano's erratic behavior, the officers talked Tofano into giving up the rocks and engaged him in small talk in an attempt to calm him down. *See* Devine Cert. ¶¶ 7, 9, 10. The officers also looked through Tofano's wallet to see if there was a medical alert notification or anything to explain his "bizarre behavior." *See* Reidel Dep., Exh. A at 54. Considering Tofano to be mentally unstable, they then decided that an evaluation by the county mental health service was necessary. *Id.* Without utilizing any force, the officers then tried to talk Tofano into getting into the squad car. *See* Reidel Dep., Exh. A at 55–56. The facts clearly show that the officers' behavior was objectively reasonable and even plaintiff's expert witness opined that trying to get Tofano to voluntarily get into the police car was proper police procedure. *See* Pickering Dep., Exh. H at 160.

Moving to the decision to arrest and handcuff Tofano, plaintiff argues that there was no basis for arresting Tofano as he had not committed any violent act, but was simply acting "tumultuously." Pl.Br. at 6. This court does not agree. Probable cause for an arrest does not arise solely from violent acts. Moreover, the decision to arrest and handcuff Tofano was reasonable given his behavior. The officers attempted to reason with and verbally coax Tofano into custody. It was Tofano who introduced the element of physical force into the encounter when he grabbed Stitz and dragged him through the parking lot. Stitz was acting reasonably when, as he was pulled by Tofano, he attempted to handcuff Tofano and informed him that he was under arrest for disorderly conduct.[15]

---

**14.** Stitz asks that the court separately analyze each officer's participation and rule separately as to each one. *See* Stitz Br. at 15. In support of this request, Stitz points to the fact that he was partially blinded from the pepper spray and, therefore, he "only dimly perceived of the positions of the other actors in the melee" and was simply aiding his fellow officers by holding Tofano's legs. *Id.* at 18. Generally, a court will examine the defendants' conduct separately. *See Rouse v. Plantier,* 182 F.3d 192, 199–200 (3d Cir.1999) (admonishing the district court for not ad-dressing the specific conduct of each of the individual defendants in determining whether that particular defendant acted in an objectively unreasonable manner). This court need not address each officer's actions separately in this case, however, because it finds that their acts, even in combination, were not objectively unreasonable.

**15.** Pickering's opinion that Stitz should not have tried to handcuff Tofano when Tofano was out of control because it provided him with a weapon does not establish that the

The officers were also acting reasonably—and neither plaintiff nor her expert disagrees—when they attempted to subdue Tofano with pepper spray. Because Tofano was actively resisting arrest and had slashed Devine's neck with the handcuff, the officers' use of pepper spray was warranted. *See* Pickering Dep., Exh. H at 73–74. Moreover, the officers were well within their rights to wrestle the pepper spray away from Tofano after he had grabbed it and was pointing it at one of the officers and, indeed, would have been remiss if they had not done so. Pickering again agrees. *See* Pickering Dep., Exh. H at 77 (agreeing that, in his opinion, the officers were entitled to wrestle the pepper spray from Tofano's hands).

This brings the court to the stage at which Tofano ran from the officers into building seven of the condominium complex, unaffected by the pepper spray, and was ultimately held down by the officers in a prone position at the base of the stairwell shortly before he died. Because plaintiff contends that, based upon the medical evidence, there are material issues of fact in dispute regarding this stage of the altercation, *see* Pl.Br. at 11–13, this court will set forth its assumptions before moving to an assessment of whether the officers' behavior was reasonable. This court is mindful that in cases, such as this, in which the defendant officers are the only surviving witnesses, the court

> must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. In other words, the court may not simply accept what may be a self-serving account by the police officer.

*Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995).

To begin, there is the issue of whether the officers caused Tofano's death. Pointing to Dr. Roh's report, plaintiff contends that there are, at the very least, triable issues of fact as to whether the officers "compressed Tofano's chest, or otherwise physically cut off his breathing." Pl.Br. at 10. This contention does not create a material issue of fact as this court will assume that the positioning of the officers inhibited Tofano's breathing and, at least in part, caused his death. In other words, this court will assume that plaintiff's death resulted, at least in part, from positional asphyxiation, and not solely from cocaine toxicity although the latter could certainly have been the case. Clearly, the officers would not be liable for causing Tofano's death if it was caused solely by an overdose of cocaine, a possibility that has not been definitively ruled out. *See* Exh. F (Dr. Zugibe's opinion that "death due to cocaine toxicity, *per se* cannot be fully excluded"); Roh Dep. at 24 (acknowledging that the level of cocaine in Tofano's system "could" cause death).

Plaintiff also contends that, contrary to the officers' testimony that Tofano was on his side when they were wrestling with him, *see* Reidel Dep., Exh. A at 89, medical evidence showing bits of gravel embedded in Tofano's chest establishes that Tofano's chest was on the ground. *See* Pl.Br. at 12. For purposes of this motion, this court will assume that Tofano's chest was on the ground. Having made these assumptions, there are no issues of material fact in dispute and this court will proceed to an evaluation of whether the force applied was excessive.

Plaintiff argues that, even if it was proper to arrest Tofano, the officers used excessive force in effectuating the arrest when they held him in a position that

---

officers acted unconstitutionally. *See* Pickering Dep., Exh. H at 57. Indeed, Pickering testified, and this court so finds, that Stitz's

attempt to handcuff Tofano did not constitute excessive force. *See id.* at 58, 172.

constricted his breathing causing death. Plaintiff points to the fact that three officers arrested one person. In addition, plaintiff concentrates on the following aspects of the medical evidence: bits of gravel embedded in Tofano's chest, abrasions indicating that Tofano's lip rubbed against his lower teeth, pinprick hemorrhages on the lower eyelids and in the scalp suggesting that blood flow to the head was blocked, and signs of trauma to the larynx. *See* Pl.Br. at 10. This evidence indicates, plaintiff argues, that Tofano died because his breathing was physically cut off due to the officers compressing his chest and/or neck. *See id.* As such, plaintiff contends that the officers used excessive force in executing the arrest.

The use of three officers to ultimately arrest Tofano was not objectively unreasonable. Again, Tofano was over six feet tall, weighed over 200 pounds, and was very well built. Plaintiff testified that Tofano used to play college football, Tofano Dep., Exh. M at 28, and he worked out "meticulously" utilizing both weights and aerobic exercise at a gym he attended "four times a week, maybe more" for a couple of hours at a time. *Id.* at 40–41, 130. Plaintiff described Tofano as being in "good physical shape," "strong," and "muscular," *see id.* at 39–40, which is exactly how he was perceived by the officers. Certainly, Tofano's physical strength created the need for several officers when he was behaving in a loud and boisterous fashion, apparently having visual hallucinations, and was actively resisting the officers' directives.

Taking into consideration all of the circumstances of this case, holding plaintiff in a prone position, even if it could have contributed to his death, was not objectively unreasonable. As stated previously, the Supreme Court has suggested three factors at which to look in determining what amount of force is objectively reasonable: the severity of the crime at issue; whether the suspect posed an immediate threat to the officers or others; and whether he or she was actively resisting or evading arrest. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

Although violating the noise ordinances and disorderly conduct are not serious offenses, Tofano's behavior soon involved assaults on police officers when he slashed Devine's neck with a handcuff, threw Stitz into the patrol car, pointed the pepper spray at Devine, and continually kicked Devine when he was on the ground. As for posing a threat, plaintiff's expert, Pickering, acknowledged that because Tofano was emotionally disturbed and under the influence of controlled substances, he posed an imminent threat to himself and others. *See* Pickering Dep., Exh. H at 51. Indeed, this threat was realized when Tofano's actions resulted in injuries to the officers.

Finally, there is no question that Tofano was actively resisting arrest. He rebuffed the officers' efforts to verbally encourage him to enter the police car, evaded being fully handcuffed, pointed a pepper spray canister at Devine, and ran from the officers. In addition, he continually kicked and fought the officers as they tried to hold him on the ground to finish handcuffing him. "Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998). It is clear that the officers attempted to use other, less forceful, means of restraining Tofano. When these means failed, however, "[a]uthorities must be allowed to graduate their response to the demands of any particular situation." *United States v. Montoya de Hernandez*, 473 U.S. 531, 542, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (citation omitted).

Other circumstances of this case illustrate that holding Tofano in a prone position was not objectively unreasonable. First, the record reflects that the officers did not intend to place Tofano in a prone

position but that, during the altercation, the officers and Tofano fell down the stairs onto the ground. In addition, unrefuted testimony reveals that the entire physical altercation between the officers and Tofano lasted only about two minutes. This fact distinguishes this case from other positional asphyxiation cases in which suspects were deliberately placed in restrictive prone positions, including "hogtying,"[16] for lengthy periods of time.[17]

Moreover, there is no evidence that the officers punched, slapped, kicked or otherwise delivered any blows to Tofano.[18] Rather, the officers simply held him down in an attempt to gain control over him. Furthermore, the officers were not aware, and plaintiff does not suggest that they should have been aware, of other elements that may have placed Tofano at a greater risk of positional asphyxiation. These elements include his body's increased oxygen demand due to cocaine toxicity as well as his congenital heart defect that "can render such a person susceptible to fatal arrhythmia during increased states of physical activity." Exh. F; Roh Dep. at 41 (testifying that if a person has a toxic level of cocaine in his or her body and other factors increase the person's heartbeat, he or she becomes more susceptible to death).

Finally, Pickering's expert report does not alter this court's conclusion that the officers' behavior was objectively reasonable. Although Pickering conceded that the officers' use of handcuffs and pepper spray, wrestling with Tofano in the stairwell, and tackling him on the ground to control him did not constitute excessive force, see Pickering Dep., Exh. H at 172–73, he opined that the officers' positioning on Tofano's body while on the ground did constitute excessive force. See id. at 173. Whether an amount of force legally constitutes excessive force, i.e. is objectively unreasonable force, however, cannot be definitively established by the testimony of an expert. As the Court of Appeals for the Fifth Circuit has put it, a court can con-

16. Hog-tying involves placing the suspect in a prone position with his or her hands secured by handcuffs and legs held together with restraints. The hand and leg restraints are then connected, resulting in the slight elevation of the suspect's upper and lower body. See Gutierrez v. City of San Antonio, 139 F.3d 441, 444 (5th Cir.1998). This technique is sometimes called a "cradle cuff." Vizbaras v. Prieber, 761 F.2d 1013, 1015 (4th Cir.1985), cert. denied, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).

17. For example, in Cottrell, a suspect who was subdued after a twenty-minute struggle with police officers died of positional asphyxiation when he was transported in a police car with his feet on the rear seat and his head in the space between the front and rear seats. See Cottrell v. Caldwell, 85 F.3d 1480, 1488 (11th Cir.1996). Despite the deliberate positioning of the suspect and the length of time that elapsed while the suspect was being transported, however, the Court of Appeals for the Eleventh Circuit held that the officers were qualifiedly immune from claims of excessive force or custodial mistreatment. See id. at 1491–92.

18. Plaintiff's suggestion that it could be concluded from the medical evidence that a chokehold was applied to Tofano does not alter this court's conclusion that the behavior of the officers was objectively reasonable under the circumstances. See Pl.Br. at 9, 12, 19. First, it is by no means clear that a chokehold was applied. No mention is made of a chokehold in the complaint, Pickering's report, or Dr. Roh's autopsy report. Plaintiff bases this suggestion solely on Dr. Roh's testimony that the injuries to Tofano's larynx were consistent with compression to the neck which could have been due to a chokehold. See Roh Dep. at 88. However, Dr. Roh also testified that the injuries to the larynx could have been caused by a momentary compression of the larynx. See id. at 94. More injuries than those suffered by Tofano, such as fractures and a greater amount of hemorrhaging, would be expected if the application of force to the neck was applied over a longer period of time. See id. Even if a chokehold had been briefly applied, however, the officers' behavior was still reasonable. Given Tofano's size, his active resistance, and the potential for further injury due to an unsecured handcuff, use of a chokehold to subdue him would have been reasonable. Cf. Gassner v. City of Garland, 864 F.2d 394, 400 (5th Cir.1989) (wrestling suspect to the ground, putting him in a chokehold, and handcuffing him was objectively reasonable when the suspect was resisting arrest).

clude that "one expert accurately expresses what a reasonable police officer would do, but [the court is] not forced to so conclude by the mere presence of an expert's opinion." *Gutierrez v. San Antonio,* 139 F.3d 441, 447 (5th Cir.1998). Despite Pickering's opinion, it is clear to this court that the actions taken by the officers were objectively reasonable under the circumstances of this case.

Indeed, this conclusion comports with the decision of the Court of Appeals for the Seventh Circuit in a very similar case. In *Phillips,* after a lengthy struggle, a suspect was restrained by police officers in a prone position with his hands and legs restrained. *See Phillips,* 123 F.3d at 593. One of the officers placed her knee on the suspect's back for about a minute to control him. *See id.* at 589. The suspect stopped breathing and ultimately died. *See id.* at 590. The court held that even though the suspect's prone positioning could have contributed to his death, the officers' actions were objectively reasonable and there was no Fourth or Fourteenth Amendment violation. *See id.* at 593. In reaching that conclusion, the court noted, *inter alia:* the need to restrain the suspect for the protection of the officers and others; the suspect's active resistance to arrest; and the fact that none of the suspect's other medical conditions which may have contributed to his death, such as an enlarged heart, were apparent. *See id.* at 593–94.

Having found the conduct of the officers to be objectively reasonable, plaintiff has not alleged a violation of a clearly established constitutional right and the officers are entitled to qualified immunity. *Cf. Mellott v. Heemer,* 161 F.3d 117, 121 (3d Cir.1998) (reversing district court's denial of summary judgment and holding that officers were entitled to qualified immunity because officers' actions were objectively reasonable as a matter of law under the Fourth Amendment test set forth in *Graham* and, thus, plaintiffs had not alleged a violation of a constitutional right).

Even if this court were to accept Pickering's opinion, however, and conclude that the officers' behavior could be found to be objectively unreasonable and, thus, violative of a clearly established Fourth Amendment right, the officers are still entitled to qualified immunity under the second part of the qualified immunity test because "reasonable officials in the [officers'] position at the relevant time could have believed . . . that their conduct would be lawful." *Good v. Dauphin County Social Services,* 891 F.2d 1087, 1092 (3d Cir. 1989). In other words, if reasonable officers could believe that a certain course of conduct is unlawful but other reasonable officers could believe that the conduct was lawful, qualified immunity attaches. *See In re City of Philadelphia Litigation,* 49 F.3d 945, 961 n. 14 (3d Cir.), *cert. denied,* 516 U.S. 863, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995). As Judge Greenberg pointed out, the test for qualified immunity is not whether a reasonable officer could have believed that the conduct in question was *unlawful,* as this places a heavier burden on the officer than is appropriate. *See Philadelphia,* 49 F.3d at 961 n. 14. Rather, the officer is entitled to qualified immunity if a reasonable officer could have believed that, under the circumstances at that time, the conduct would be *lawful. Id.; see also Anderson,* 483 U.S. at 641, 107 S.Ct. 3034 (for purposes of qualified immunity, "[t]he relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the conduct to be lawful] in light of clearly established law and the information the . . . officers possessed"); *Mellott v. Heemer,* 161 F.3d 117, 121 (3d Cir.1998) (stating that the second part of the qualified immunity test is "whether the defendants reasonably could have believed that their conduct did not violate clearly established law"), *cert. denied,* —— U.S. ——, 119 S.Ct. 2051, 144 L.Ed.2d 217 (1999). As the Supreme Court has put it, "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably

competent officer would have concluded that [the action was lawful]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Thus, even if this court were to accept Pickering's opinion that at least in one respect the officers' conduct could be deemed objectively unreasonable, it is clear from the record that reasonable police officers in the officers' positions could also find the officers' conduct to be objectively reasonable and, hence, lawful. The circumstances of this case—including, but not limited to, Tofano's size, his bizarre behavior, his refusal to follow the officers' directives, and his violent resistance to arrest resulting in police officers being injured—clearly establish that officers of reasonable competence could at least disagree as to whether the officers' conduct was reasonable. *See Malley,* 475 U.S. at 341, 106 S.Ct. 1092. As such, the officers are qualifiedly immune from suit. *Id.*

### 2. Municipality Liability for Ramsey

Plaintiff also brings claims under 42 U.S.C. § 1983 against Ramsey, alleging that the municipality developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Ramsey and which caused the violation of Tofano's civil rights. *See* Compl. ¶ 39.[19] A municipality can only be held liable under § 1983 when "a constitutional deprivation results from an official custom or policy." *Montgomery v. De Simone, PTl,* 159 F.3d 120, 126 (3d Cir. 1998) (citing *Monell v. Department of Social Servs. of City of New York,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

Although plaintiff does not point to any specific policies or customs in her complaint, she sets forth three contentions in her brief. First, plaintiff contends that Reidel, the highest ranking officer on duty that night, made a "policy decision" to immediately arrest Tofano even though Tofano initially posed no danger to the officers. Pl.Br. at 25. Second, plaintiff contends that Ramsey had a policy that pepper spray could be used whenever a person did not comply with an officer's direction. *See id.* Finally, plaintiff contends that Ramsey did not properly train its police officers to deal with mentally unstable people. *See id.* None of these contentions is sufficient to support a finding of municipal liability under 42 U.S.C. § 1983.

Despite plaintiff's characterization, Reidel's decision to arrest Tofano was not a "policy decision" simply because Reidel was the highest ranking officer on duty that night. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (citations omitted), *cert. denied,* 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997). Nothing in the record indicates that Reidel had authority to, nor attempted to, establish municipal policy when he decided to arrest Tofano.

Moving on, assuming Ramsey had a policy that pepper spray could be used whenever a person did not comply with an officer's direction, the record does not support a finding that a constitutional deprivation resulted from this policy. The officers utilized pepper spray on Tofano only after he rebuffed the officers' efforts to talk him into voluntarily going with them, actively

19. Although plaintiff contends in the complaint that Ramsey "is legally responsible for the actions [of Reidel, Devine, and Stitz] pursuant to the doctrine of 'respondeat [sic] superior[,]'" Compl. ¶ 16, plaintiff disavows this contention in her brief. *See* Pl.Br. at 25.

It is well-established that "[a] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir.1995).

resisted arrest, slashed Devine's neck with a handcuff, and avoided Reidel's efforts to physically control him. It is clear that, under these circumstances, the use of pepper spray was not an excessive use of force, and, indeed, Pickering opined that the officers' use of the pepper spray was appropriate and reasonable. *See* Pickering Dep., Exh. H at 73–74, 172.

██ Finally, plaintiff's contention that Ramsey is liable under § 1983 for failing to train its officers in properly dealing with mentally unstable people is rejected. First, it is by no means clear, despite Pickering's conclusions to the contrary, that the officers deviated from acceptable police practices and procedures which, notably, she does not define, in handling one who was or who appeared to be mentally disturbed. *Cf.* Exh. G at 7. The officers were instructed to speak to people perceived to be mentally unstable differently than other suspects. *See* Devine Dep., Exh. C at 14. Thus, when Reidel was trying to calm Tofano down, he tried to appease him by asking Tofano to show him where the imaginary people were and telling him that he could see these people. *See* Pickering Dep., Exh. H. at 156–57; Exh. J ¶ 6. In addition, the officers immediately recognized that Tofano was mentally unstable and acted appropriately when they tried to talk him into getting into the car so that he could receive medical assistance from 262–HELP, the County mental health division. *See* Reidel Dep., Exh. A at 49, 51–52; Exh. J ¶ 5.

██ More importantly, however, "a municipality's failure to train police officers only gives rise to a constitutional violation when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Montgomery,* 159 F.3d at 126–27 (citing *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Plaintiff has presented absolutely nothing which would establish that Ramsey was *deliberately indifferent* to the rights of its citizens by failing to properly train its

officers to deal with mentally unstable individuals. The record is devoid of any evidence of interactions in the past between Ramsey police officers and mentally unstable individuals which would have placed the municipality on notice that its training was inadequate. *See Board of the County Comm'rs v. Brown,* 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (stating that a city's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability"); *see also Canton v. Harris,* 489 U.S. 378, 397, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (O'Connor, J., concurring in part and dissenting in part) (stating that "municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations …"); *Montgomery,* 159 F.3d at 127 (failure to train officers can only form the basis for municipal liability under § 1983 "if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate"). In addition, nothing in the record establishes that it would have been known or "obvious" to a reasonable policymaker that the training provided to Ramsey police officers concerning interaction with mentally unstable individuals would likely result in the deprivation of constitutional rights. *See Brown,* 520 U.S. at 409, 117 S.Ct. 1382 (stating that absent a pattern of constitutional violations providing notice to a municipality, in limited circumstances deliberate indifference may be found if a "municipality has failed to train its employees to handle recurring situations presenting an obvious potential for [constitutional violations]").

**307**

Thus, Ramsey is entitled to summary judgment on the § 1983 claims brought against it.

### 3. State Law Claims

 The officers and Ramsey also move for summary judgment as to plaintiff's state law claims of assault and battery (Counts Three and Four) and negligence (Count Eight). The New Jersey Tort Claims Act provides that:

> A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.

N.J.S.A. § 59:3–3 (1992). The Supreme Court of New Jersey has stated that "[a]dopting the analysis used in federal civil rights cases, our courts have ruled that to obtain summary judgment [on good faith immunity under N.J.S.A. § 59:3–3], a public employee must establish that her conduct was 'objectively reasonable.'" *Fielder v. Stonack*, 141 N.J. 101, 131–32, 661 A.2d 231 (1995). The officers contend, and plaintiff does not dispute, that the same objective reasonableness test set forth in *Harlow* and *Anderson* for qualified immunity with reference to Section 1983 claims "also applies 'in determining questions of good faith arising under the Tort Claims Act, N.J.S.A. 59:3–3.'" *Gurski v. New Jersey State Police Dep't*, 242 N.J.Super. 148, 162, 576 A.2d 292 (App.Div.1990); *see also Wildoner v. Borough of Ramsey*, 316 N.J.Super. 487, 504, 720 A.2d 645 (App.Div.1998) (stating that New Jersey courts have adopted "'the objective good-faith standard' of *Harlow v. Fitzgerald* . . . for the good-faith defense set forth in the first sentence of N.J.S.A. 59:3–3"), *certif. granted*, 158 N.J. 75, 726 A.2d 938 (1999); *Rouse v. Plantier*, 182 F.3d 192, 196 (3d Cir.1999); *Lear v. Township of Piscataway*, 236 N.J.Super. 550, 553, 566 A.2d 557 (App.Div.1989) (same). As this court has found that plaintiff's § 1983 claims against the officers must fail because their behavior vis-a-vis Tofano was objectively reasonable, the officers are entitled to qualified immunity on plaintiff's state law claims under N.J.S.A. § 59:3–3. Likewise, Ramsey is entitled to summary judgment on plaintiff's state law claims because "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J.S.A. § 59:2–2 (1992).

### III. CONCLUSION

For the above stated reasons, the motion filed by Devine and Reidel to exclude the testimony of Dr. Roh is denied but the motions for summary judgment filed by all defendants are granted. An appropriate order will issue.