343 F.3d 1052
 Brian Thomas DRUMMOND, by and through his Guardian ad Litem Thomas R. DRUMMOND, Plaintiff-Appellant,
v.
CITY OF ANAHEIM, a California municipal entity, Anaheim Police Department, a California municipal entity, Roger Baker, Christopher Ned, Kristi Valentine, Brian Mcelhaney, Gregory Sawyer, Defendants-Appellees.
 No. 02-55320.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 3, 2003 — Pasadena, California.
 Filed September 10, 2003.
 
 Federico C. Sayre and Kent M. Henderson, Law Offices of Federico C. Sayre, Santa Ana, California, for the plaintiff-appellant.
 Deborah P. Knefel, Deputy City Attorney, Anaheim, California, and William F. Bernard, Orange, California, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Alicemarie H. Stotler, District Judge, Presiding. D.C. No. CV-00-00243-AHS.
 Before JAMES R. BROWNING, HARRY PREGERSON, and STEPHEN REINHARDT, Circuit Judges.
 OPINION
 REINHARDT, Circuit Judge.
 
 
 1
 We again confront the interplay of excessive force and qualified immunity in a case in which a mentally disturbed individual suffers serious injuries as a result of an encounter with police officers. Once again, we reverse the grant of summary judgment in favor of the officers and remand for a trial on the merits. Three Anaheim police officers determined that Brian Drummond, who was unarmed and mentally ill, should be taken to a medical facility for his own safety, but the manner in which they attempted to subdue and restrain him resulted in his falling into a coma from which he has never recovered. Drummond brought suit under 42 U.S.C. § 1983, alleging that the officers used excessive force, in violation of the Fourth Amendment. We hold that, under the circumstances, it would have been clear to a reasonable officer at the time of the encounter that the force alleged was constitutionally excessive. We therefore reverse the district court's grant of summary judgment in favor of the defendants and remand for further proceedings.
 
 I. BACKGROUND[1]
 
 2
 On March 25, 1999, Brian Drummond's fiancee Olivia Graves called the Anaheim police. Drummond, who had a history of mental illness (bipolar disorder and schizophrenia), had run out of medication and was hallucinating and paranoid. Graves asked the police to help her take Drummond to the hospital to receive medical assistance.
 
 
 3
 Four Anaheim police officers responded to Graves's call; among them were Kristi Valentine, a rookie, and Christopher Ned, her training officer. The officers determined that Drummond was not a danger to himself or others — the criteria for an involuntary psychiatric detention under CAL. WELF. & INST. CODE § 5150. The officers therefore refused to take him into custody, for transport or otherwise. Graves alleges that the officers were "not very professional," and were "joking around" throughout the encounter. Later, Drummond voluntarily accompanied Graves to a medical facility to obtain the lithium that had been prescribed for him, but he had neither medical insurance nor enough money with him to obtain the drugs and left without them.
 
 
 4
 The next night, the Anaheim police were again called to help protect Drummond; his neighbor, David Kimbrough, called the police because he was afraid that Drummond was going to hurt himself by darting into traffic. Officers Ned, Valentine, and Brian McElhaney, responding to the call, found Drummond in a 7-Eleven parking lot; Ned and Valentine recognized him as the subject of the call from the night before. Drummond, who was unarmed, was hallucinating and in an agitated state, and the officers called for an ambulance to transport him to a medical facility, pursuant to § 5150. Before the ambulance arrived, however, the three officers decided to take him into custody, "for his own safety."
 
 
 5
 Independent eyewitnesses saw Officer Ned "knock Drummond to the ground[,] where the officers cuffed his arms behind his back as Mr. Drummond lay on his stomach." Although Drummond offered no resistance, McElhaney "put his knees into Mr. Drummond's back and placed the weight of his body on him. [Ned] also put his knees and placed the weight of his body on him, except that he had one knee on Mr. Drummond's neck."
 
 
 6
 Drummond weighed only 160 pounds at the time of the incident; although there is no indication of McElhaney's weight in the record, Ned weighed approximately 225 pounds at the time. With the two officers leaning on his neck and upper torso, Drummond soon fell into respiratory distress. Two eyewitnesses verified that "Mr. Drummond repeatedly told the officers that he could not breathe and that they were choking him. He also told them that he was thirsty and needed a glass of water. The officers however continued to put their weight upon Mr. Drummond[']s back and neck." One of these eyewitnesses, Victor Calleja, stated that although McElhaney and Ned were "obviously causing [Drummond] to have trouble breathing," "[t]he officers were laughing during the course of these events."
 
 
 7
 Approximately twenty minutes after Drummond was taken down, Officer Gregory Sawyer arrived at the parking lot. The officers then obtained a "hobble restraint," which they used to bind Drummond's ankles.[2] One minute after the restraint was applied, Drummond went limp, and the officers realized that he had lost consciousness. They checked his pulse, and then removed the handcuffs and hobble restraint and turned him over, onto his back. The officers attempted to perform CPR on Drummond until the paramedics finally arrived.
 
 
 8
 Although Drummond was revived approximately seven minutes after losing consciousness, he sustained brain damage and fell into a coma. He is now in a "permanent vegetative state."
 
 
 9
 Drummond's medical expert, Dr. Sunil Arora, is the Medical Director of the Neurological Care Unit at the Community Hospital of San Bernadino, and one of Drummond's treating physicians. Arora submitted a declaration stating that, to a reasonable medical probability, Drummond "suffered a cardiopulmonary arrest caused by lack of oxygen to his heart. The lack of oxygen ... was caused by his inability to breathe caused by mechanical compression of his chest wall such that he could not inhale and exhale in a normal manner. [Arora believes] that this occurred when [Drummond] was face[-] down on the ground and the police officers set upon his back preventing the anterior wall of his chest from expanding."
 
 
 10
 Drummond filed a complaint in the district court. The complaint named as defendants the city of Anaheim, the Anaheim police department and its police chief, and the individual officers who responded to the March 26 call; it alleged federal claims for violations of §§ 1981 and 1983, and state claims for assault and battery, negligent use of force, negligent hiring and training, and intentional infliction of emotional distress. The defendants moved for summary judgment, which the district court granted, finding both that there was no constitutional violation by any defendant, and that even if there were a violation, the law was not sufficiently clearly established that a reasonable officer would have known the conduct to be unconstitutional. As a result, the court held that all defendants were entitled to qualified immunity as a matter of law. The court also granted summary judgment in favor of the defendants as to Drummond's state claims, holding that each such claim depended on the showing of a constitutional violation. Drummond timely appealed.
 
 II. DISCUSSION
 
 11
 Drummond contends that the district court erred in finding qualified immunity on behalf of the city and its police officers.[3] Specifically, Drummond contends that his allegations present a genuine issue of material fact as to whether the officers' conduct violated the Constitution, and that any reasonable officer would have understood the alleged conduct to constitute such a violation.
 
 
 12
 Due in part to the volume of excessive force cases in this circuit, the legal framework for evaluating such cases is, by now, straightforward.
 
 
 13
 In order to decide whether state officers are entitled to qualified immunity, Saucier [v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001),] instructs that we must first determine whether, "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show [that] the officer's conduct violated a constitutional right." Saucier, [533 U.S. at 201, 121 S.Ct. 2151]. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established... in light of the specific context of the case" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.
 
 
 14
 Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1129 (9th Cir.2002) [Headwaters II]; see also Robinson v. Solano County, 278 F.3d 1007, 1012-13 (9th Cir.2002)(en banc) (same).
 
 
 15
 A. The Alleged Conduct Violated the Constitution
 
 
 16
 Following Saucier, we first determine whether, on the facts offered in support of Drummond's claim, the Anaheim officers' conduct violated the constitutional prohibition against the use of excessive force. As we have explained:
 
 
 17
 A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in Graham v. Connor, [490 U.S. 386, 109 S.Ct. 1865 (1989)]. That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. [Id. at 396, 109 S.Ct. 1865.] Determining whether a police officer's use of force was reasonable or excessive therefore "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. Id.; see Deorle v. Rutherford, 272 F.3d 1272, 1279-81 (9th Cir.2001). Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. See, e.g., Liston v. County of Riverside, 120 F.3d 965, 976 n. 10[ (9th Cir.1997)] (citing several cases). This is because police misconduct cases almost always turn on a jury's credibility determinations. This case is no different.
 
 
 18
 Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002).
 
 1. The Severe Nature of the Force Applied
 
 19
 "We first assess the quantum of force used to arrest [the plaintiff] by considering `the type and amount of force inflicted.'" Deorle, 272 F.3d at 1279 (internal citations omitted). Although the officers in this case did not shoot or beat Drummond, the force allegedly employed was severe and, under the circumstances, capable of causing death or serious injury. Drummond claims that two officers continued to press their weight on his neck and torso as he lay handcuffed on the ground and begged for air. Under similar circumstances, in what has come to be known as "compression asphyxia," prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers. See, e.g., Jones v. Ralls, 187 F.3d 848, 850, 852 n. 4 (8th Cir.1999); Bozeman v. Orum, 199 F.Supp.2d 1216, 1226 (M.D.Ala.2002); Tofano v. Reidel, 61 F.Supp.2d 289, 292-95 (D.N.J.1999); Alexander v. Beale St. Blues Co., 108 F.Supp.2d 934, 939 (W.D.Tenn.1999); Johnson v. City of Cincinnati, 39 F.Supp.2d 1013, 1018 (S.D.Ohio 1999); see also cases cited infra at 1061.[4]
 
 2. The Minimal Need for the Force
 
 20
 "[F]orce, [even if] less than deadly, is not to be deployed lightly. To put it in terms of the test we apply: the degree of force used by [the police] is permissible only when a strong government interest compels the employment of such force." Deorle, 272 F.3d at 1280 (emphasis added). See also Headwaters II, 276 F.3d at 1130 ("`[T]he essence of the Graham objective reasonableness analysis' is that'[t]he force which [i]s applied must be balanced against the need for that force: it is the need for force which is at the heart of the Graham factors.'") (quoting Liston v. County of Riverside, 120 F.3d 965, 976 (9th Cir.1997)).
 
 
 21
 In Graham, the Supreme Court specified that the government interest in safely effecting an arrest must be "examined in light of the `severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Santos, 287 F.3d at 854 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). In this case, we recognize that some degree of physical restraint may have been necessary to prevent Drummond from injuring himself. The facts as we must accept them, however, reflect no justification for the degree of force used here.
 
 
 22
 Applying the Graham factors to the physical restraint of Drummond, we note first that no underlying crime was "at issue" — the police had become involved solely because a neighbor was worried that Drummond was acting in an emotionally disturbed manner and might injure himself. Second, while Drummond may have represented a threat (to himself or possibly others) before he was handcuffed — an action that he does not claim was in itself an excessive use of force — after he was "knock[ed] ... to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach," a jury could reasonably find that he posed only a minimal threat to anyone's safety. Finally, evidence in the record derived from an independent eyewitness unequivocally states that once Drummond was on the ground, he "was not resisting the officers"; there was therefore little or no need to use any further physical force.[5] All three Graham factors would have permitted the use of only minimal force once Drummond was handcuffed and lying on the ground.
 
 
 23
 Furthermore, we have held that a detainee's mental illness must be reflected in any assessment of the government's interest in the use of force:
 
 
 24
 The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis.... Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual. We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals. Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed.
 
 
 25
 Deorle, 272 F.3d at 1282-83.
 
 
 26
 3. Balancing the Severe Force Against the Minimal Need
 
 
 27
 Ultimately, our duty to balance the officers' substantial application of force against the government's less-than-overwhelming interest in that force amounts to determining whether the force employed was "greater than is reasonable under the circumstances." Santos, 287 F.3d at 854. This determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S.Ct. 1865. Nevertheless, "it is equally true that even where some force is justified, the amount actually used may be excessive." Santos, 287 F.3d at 853.
 
 
 28
 Here, some force was surely justified in restraining Drummond so that he could not injure either himself or the arresting officers. However, after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted. Drummond was a mentally disturbed individual not wanted for any crime, who was being taken into custody to prevent injury to himself. Directly causing him grievous injury does not serve that objective in any respect. Once on the ground, prone and handcuffed, Drummond did not resist the arresting officers. Nevertheless, two officers, at least one of whom was substantially larger than he was, pressed their weight against his torso and neck, crushing him against the ground. They did not remove this pressure despite Drummond's pleas for air, which should have alerted the officers to his serious respiratory distress. Moreover, according to independent eyewitnesses, other officers "stood around and laughed" while Drummond was restrained; although the officers' "underlying intent or motivation" is irrelevant to the excessive force inquiry, Graham, 490 U.S. at 397, 109 S.Ct. 1865, the officers' apparent lack of concern does indicate that Drummond was not sufficiently dangerous to others to warrant the use of the severe force applied.
 
 
 29
 The officers — indeed, any reasonable person — should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable. In this case, it is even more striking that the officers had been specifically warned of the extreme danger of this sort of force. Not only was there ample publicity in Southern California regarding similar instances of asphyxiation as a result of the use of similar force in the months before the incident, see $650,000 Settlement OKd in Inmate Death, L.A. TIMES, Feb. 24, 1999, at B4; Supervisors Asked to OK $2.5 Million to Settle Suits, L.A. TIMES, Feb. 2, 1999, at B1; but, more important, the Anaheim police department had issued a training bulletin in April of 1998 specifically warning officers that "when one or more [officers] are kneeling on a subject's back or neck to restrain him, compression asphyxia can result [`t]hat may be a precipitating factor in causing death.'" Anaheim Training Bulletin # 98-14 (Apr.1998). Although such training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable. As the Fifth Circuit stated, "it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned." Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir.1998). See also Scott v. Henrich, 39 F.3d 912, 916 (9th Cir.1994) ("Thus, if a police department limits the use of chokeholds to protect suspects from being fatally injured, ... such regulations are germane to the reasonableness inquiry in an excessive force claim.") (internal citations omitted).[6] Viewing the facts in the light most favorable to Drummond, and resolving all disputed facts in his favor, we hold that under the circumstances, the officers' use of severe force was constitutionally excessive.
 
 
 30
 B. The Constitutional Violation Was Clearly Established
 
 
 31
 Because we hold that Drummond's factual allegations, if true, establish a constitutional violation, we must proceed to the second step in the qualified immunity analysis: whether the law was clearly established such that a reasonable officer would have known that the conduct alleged was unlawful. The Supreme Court has stated that officers are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). There is no question that Drummond's basic constitutional right to be free from excessive force was clearly established as of 1999, but our inquiry is more specific than that. The defendants argue that the officers should not be held liable because reasonable officers would not have understood that they were violating the constitution by subduing Drummond with the degree of force they employed. Saucier allowed for the possibility that an officer might misunderstand the amount of force permissible under particular factual circumstances, and held that "[i]f the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." Saucier, 533 U.S. at 205, 121 S.Ct. 2151. Accordingly, we now decide "whether it would [have been] clear to a reasonable officer[in 1999] that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. 2151; see also Robinson, 278 F.3d at 1015. We hold that, under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and that any mistake to the contrary would have been unreasonable.
 
 
 32
 "`[I]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established' for qualified immunity purposes, `including decisions of state courts, other circuits, and district courts.'" Malik v. Brown, 71 F.3d 724, 727 (9th Cir.1995) (internal citations and quotation marks omitted). Even "unpublished decisions of district courts may inform our qualified immunity analysis." Sorrels v. McKee, 290 F.3d 965, 971 (9th Cir.2002).[7] However, it is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); see also Deorle, 272 F.3d at 1285-86 ("Although there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle [the defendant] to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established. Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct.") (internal citation omitted). As the Supreme Court recently reiterated:
 
 
 33
 [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.... [T]he salient question that the Court of Appeals ought to have asked is whether the state of the law [at the time of the alleged wrong] gave respondents fair warning that their alleged treatment of [the petitioner] was unconstitutional.
 
 
 34
 Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). See also United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though `the very action in question has[not] previously been held unlawful,' Anderson, [483 U.S. at 640, 107 S.Ct. 3034.] ... `The easiest cases don't even arise.'") (internal citation omitted).
 
 
 35
 Viewing the evidence in the light most favorable to Drummond, we conclude that the officers had "fair warning" that the force they used was constitutionally excessive even absent a Ninth Circuit case presenting the same set of facts. The officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance. Any reasonable officer should have known that such conduct constituted the use of excessive force. Moreover, not only did local newspaper publicity less than two months before the incident publicize cases of compression asphyxia, see supra at 1059, and not only did prior federal cases describe the dangers of pressure on a prone, bound, and agitated detainee, see Swans v. City of Lansing, 65 F.Supp.2d 625, 633-34 (W.D.Mich.1998); Estate of Bryant v. Buchanan, 883 F.Supp. 1222, 1224 (S.D.Ind.1995); but the officers received training from their own police department explaining specifically that "when one or more[officers] are kneeling on a subject's back or neck to restrain him, compression asphyxia can result [`t]hat may be a precipitating factor in causing death.'" Anaheim's training materials are relevant not only to whether the force employed in this case was objectively unreasonable, see supra section I.A.3, but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable.
 
 
 36
 The force allegedly employed by the officers was certainly not warranted, and reasonable officers would clearly have known that it was not. We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case. Cf. LaLonde, 204 F.3d at 961 ("[I]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of[force] or a refusal without cause to alleviate its harmful effects constitutes excessive force."). We hold, on the record before us, that the officers violated Drummond's constitutional rights and that, because the law was clearly established, any reasonable officer would have known that the force used amounted to a constitutional violation. We therefore reverse the district court's grant of summary judgment in favor of the individual officers and remand for trial.
 
 C. Drummond's Other Claims
 
 37
 In addition to the excessive force claims against the individual officers, Drummond alleged claims under 42 U.S.C. § 1983 against the city of Anaheim and its police department, and several state law claims against both the city and the individual officers. The district court held that a finding of excessive force was necessary, if not sufficient, to permit recovery on each of these claims. Because it determined that the force at issue here was not excessive, it granted summary judgment on Drummond's remaining claims in favor of the defendants. See Robinson v. Solano County, 278 F.3d 1007, 1016 (9th Cir.2002) (agreeing that similar claims depend on a finding of excessive force).
 
 
 38
 As we hold, supra, the district court erred in its predicate judgment that the facts alleged do not support a finding of a constitutional violation; it therefore erred in granting summary judgment against Drummond on his remaining claims. Because none of the parties has briefed on appeal any issue involving the remaining claims, we decline to exercise our discretion to determine whether we would affirm the district court on other grounds with respect to any of them. See Coszalter v. City of Salem, 320 F.3d 968, 979 (9th Cir.2003). Instead, we vacate the judgment in its entirety and remand to allow the district court the opportunity to address the remaining claims in light of our determination that the facts alleged constitute a constitutional violation.[8]
 
 III. CONCLUSION
 
 39
 Police officers were called to take a mentally ill individual into custody for his own safety, but within a half-hour, they had caused him to fall into a coma that has left him in a vegetative state. Drummond was knocked to the ground and handcuffed; despite the fact that he offered no resistance, the officers then allegedly pressed their weight onto his neck and torso, and maintained that pressure for a significant period of time, ignoring his pleas for air. The compression asphyxia that resulted appears with unfortunate frequency in the reported decisions of the federal courts, and presumably occurs with even greater frequency on the street. Indeed, the Anaheim Police Department was sufficiently concerned about compression asphyxia that in a training bulletin, it specifically warned its officers of the danger of kneeling on a detainee's neck or back almost one year before the incident that sent Drummond into a coma.
 
 
 40
 Under the circumstances, we hold that the force allegedly employed was, if proven, constitutionally excessive. The force was not only severe, but it was also, on the facts asserted, wholly unwarranted. We further conclude that any reasonable officer would have understood such force to be constitutionally excessive. We therefore reverse the court's grant of summary judgment in favor of the individual officers on the § 1983 claims and remand for further proceedings. Because the district court's grant of summary judgment on Drummond's remaining claims was predicated entirely on its erroneous conclusion regarding the excessive force issue, we vacate the remainder of the district court's judgment and remand those claims as well for further proceedings consistent with this opinion.
 
 
 41
 REVERSED in part, VACATED in part, AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Because we review a grant of summary judgment, we view the evidence in the light most favorable to Drummond, the nonmoving party, and accept the version of all disputed facts most favorable to him. SeeRobi v. Reed, 173 F.3d 736, 739 (9th Cir.1999); LaLonde v. County of Riverside, 204 F.3d 947, 959 (9th Cir.2000).
 
 
 [2]
 The record does not disclose whether the three officers initially responding to the call had the hobble restraint in their cruisers, or whether Sawyer brought it with him
 
 
 [3]
 Of course, a city may not assert a defense of qualified immunity; only individual defendants may do soSee Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); Huskey v. City of San Jose, 204 F.3d 893, 902 (9th Cir.2000). Because we reverse as to the city on other grounds, we simply note this fact for the benefit of all concerned.
 
 
 [4]
 Despite the deadly history of this type of force, it is not clear whether the force allegedly applied in this case constitutes "deadly force" underTennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), to be used only if "it is necessary to prevent the escape [of a suspected felon] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Brewer v. City of Napa, 210 F.3d 1093, 1097-98 (9th Cir.2000) (quoting Garner, 471 U.S. at 3, 105 S.Ct. 1694) (internal quotation marks and emphasis omitted); see also Monroe v. City of Phoenix, 248 F.3d 851, 859 (9th Cir.2001) (noting the twin requirements of escape and serious physical harm).
 "In this circuit, under Garner, `deadly force is that force which is reasonably likely to cause death.'" Monroe, 248 F.3d at 859 (quoting Vera Cruz v. City of Escondido, 139 F.3d 659, 663 (9th Cir.1998)). Vera Cruz recognized that not merely the quantum of force, but also how that force is applied, may render it more or less likely to cause death. See Vera Cruz, 139 F.3d at 663 n. 4; cf. Robinette v. Barnes, 854 F.2d 909, 913 (6th Cir.1988) ("As we already have stated, the totality of the factors present in a particular case determine whether deadly force was used to apprehend a suspect."). Here, although the force employed by the Anaheim police is not extreme in the abstract, it may be reasonably likely to cause death when applied under certain circumstances. Because we find a genuine issue of material fact as to whether the force used was constitutionally excessive under the ordinary Graham balance, we need not decide on this appeal whether it would constitute "deadly force" under Garner.
 
 
 [5]
 Although this evidence — the summary of an interview conducted by a district attorney's investigator — may have been inadmissible hearsay, the defendants did not object below and have therefore, for purposes of this appeal, waived any objectionSee, e.g., Pfingston v. Ronan Eng'g Co., 284 F.3d 999, 1003 (9th Cir.2002) ("In order to preserve a hearsay objection, a party must either move to strike the affidavit or otherwise lodge an objection with the district court."); Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 n. 5 (9th Cir.2002) ("[Plaintiff] did not object to and has thus waived any challenge to the district court's evidentiary rulings with respect to the evidence submitted by [the defendant].").
 
 
 [6]
 Drummond also presented the declaration of David Dusenbury, the former Deputy Chief of the Long Beach Police Department, who has thirty years of experience as a police officer. Because Dusenbury's declaration is not necessary to establish a substantial question of material fact as to whether the officers' conduct was excessive under the circumstances, we need not decide whether Dusenbury would qualify as an expert witness at trial. Nevertheless, we note that after considering a comprehensive set of materials, Dusenbury concluded that:
 reasonable police officers could not believe that they were acting appropriately [for reasons which include] the facts that there were which include] the facts that there were numerous and egregious violations of numerous and egregious violations of standard police practice, violations of a number of Anaheim's own policies and procedures, the numerous protestations of Mr. Drummond witnessed by at least two independent witnesses that he was unable to breathe, the fact that he was not being stopped for a serious crime but because of his mental disturbance, the fact that after he was cuffed he presented little objectively reasonable threat of flight or to the safety of the officers, and the cavalier, perhaps malicious, attitude of the officers reflected by the fact that, if true, they were laughing a[t] Drummond during the incident. Further,... Anaheim's Police Department had [a] longstanding policy for many years before the incident which warned of putting arrestees in Drummond's state at risk of respiratory failure.
 
 
 [7]
 The defendants rely primarily on two cases to show that it would not have been clear to the Anaheim officers that their conduct was constitutionally unreasonable. InEstate of Phillips v. City of Milwaukee, 123 F.3d 586 (7th Cir.1997), the Seventh Circuit found that police used reasonable force in restraining an obese, deranged, struggling man in a prone position using handcuffs, leg shackles, and with one female officer's knee "gently sitting" on the arrestee's right shoulder for between thirty seconds and one minute. Id. at 589, 592-94. Four months later, in Price v. County of San Diego, 990 F.Supp. 1230 (S.D.Cal. 1998), a district judge held after a bench trial crediting most of the police evidence that "incidental pressure applied to [the prone, bound, struggling, methamphetamine-delirious suspect's] torso" "for a few seconds," id. at 1239-40, did not "on the particular facts of this case ... constitute excessive force." Id. at 1240 n. 17.
 Neither Phillips nor Price affects our conclusion that the Anaheim officers had "fair warning" that the force employed in this case was constitutionally excessive. The pressure allegedly applied here — two officers leaning their weight on Drummond's neck and torso for a substantial period of time — was far greater than that applied in either case above. See Phillips, 123 F.3d at 589 (one knee "gently sitting" on the detainee's shoulder for less than one minute); Price, 990 F.Supp. at 1239-40 ("incidental pressure" on the detainee's torso "for a few seconds"). Moreover, there was far less need for such pressure in the case at hand. In both Phillips and Price, the suspects were struggling violently as the police attempted to restrain them, but according to an independent eyewitness, once Drummond was on the ground, he "was not resisting the officers." Furthermore, in neither of the above cases did the court find that the police were actually put on notice of the detainee's respiratory distress. Here, Drummond offers evidence that he repeatedly told the officers that he could not breathe — indeed, that he begged for air.
 
 
 [8]
 We note that given the issue of Monell liability and Drummond's negligent hiring and training claims, the defenses of the individual officers and the municipal entities present the possibility for a conflict of interest if these parties continue to be represented by the same counsel. We leave the appropriate resolution of these claims to the district court on remand