

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-5-2007

# Bornstad v. Honey Brook

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4534

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Bornstad v. Honey Brook" (2007). *2007 Decisions.* Paper 1811.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1811

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Case No: 05-4534

KENNETH T. BORNSTAD, ADMINISTRATOR OF THE ESTATE OF KEITH B.
BORNSTAD, DECEASED,

Appellant


v.


HONEY BROOK TOWNSHIP; HONEY BROOK TOWNSHIP
POLICE DEPARTMENT; WEST BRANDYWINE TOWNSHIP;
WEST BRANDYWINE TOWNSHIP POLICE DEPARTMENT;
WILLIAM BAXTER; MICHAEL SASSO, C/O HONEY BROOK
POLICE DEPARTMENT; JOHN COLDREN, C/O
WEST BRANDYWINE TOWNSHIP POLICE DEPARTMENT;
DENISE NOKE, C/O BRANDYWINE POLOCE DEPARTMENT;
DANIEL SHAPPELL


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No.: 03-cv-3822
District Judge: The Honorable R. Barclay Surrick

_____

Argued December 12, 2006

Before: SMITH, ROTH, *Circuit Judges*,

and IRENAS,[*] *District Judge*

(Filed: January 5, 2007)

_____

Counsel:            Joseph F. Wusinich, III (Argued)
                    Edward C. Sweeney
                    Wusinich, Brogan & Stanzione
                    537 West Uwchlan Avenue, Suite 200
                    Downington, PA 19335
                    *Counsel for Appellant*

                    Andrew J. Bellwoar (Argued)
                    Michael G. Crotty
                    Siana, Bellwoar & McAndrew, LLP
                    941 Pottstown Pike, Suite 200
                    Chester Springs, PA 19425
                    *Counsel for Appellee Township of Honeybrook,
                    et al.*

                    John P. Gonzales (Argued)
                    Walter F. Kawalec, III
                    Marshall, Dennehey, Warner, Coleman &
                    Goggin
                    200 Lake Drive East, Suite 300
                    Cherry Hill, NJ 08012
                    *Counsel for Appellee West Brandywine
                    Township, et al.*

_____

OPINION OF THE COURT

_____

SMITH, *Circuit Judge*.

_____

[*]The Honorable Joseph E. Irenas, Senior District Judge for the District of New Jersey, sitting by designation.

Appellant Kenneth Bornstad filed suit against the Township of Honey Brook, Township of West Brandywine, William Baxter, Michael Sasso, John Coldren, Denise Noke, and Daniel Shappell alleging the use of excessive force in the death of his son, Keith Bornstad in violation of 42 U.S.C. § 1983.[1] The defendants moved for summary judgment. The U.S. District Court for the Eastern District of Pennsylvania granted the motion on September 9, 2005 on the grounds that the defendant police officers were protected by qualified immunity and did not use excessive force, and that the defendant townships had not exhibited deliberate indifference by failing to properly train their employees.

The questions presented on appeal are: (1) whether the trial court properly viewed all facts in the light most favorable to the appellant; (2) whether the police officers are entitled to qualified immunity; (3) whether the police officers used excessive force; (4) whether the police officers failed to render adequate medical assistance; (5) whether the townships were deliberately indifferent in failing to train the police officers in appropriate procedures; (6) whether the District Court abused its discretion in denying the plaintiff's Motion to Preclude the testimony of Dr. G. John DiGregorio; and (7) whether the District Court abused its discretion in partially precluding the testimony of R. Paul McCauley as

---

[1] Kenneth Bornstad also sought damages for wrongful death under 42 PA. CONS. STAT. §§ 8301-8302, but does not appeal the dismissal of that claim.

to the reasonableness of the officers' use of force.[2]

# I.

The District Court had subject matter jurisdiction in this case under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1291.

The standard of review for a grant of summary judgment is plenary. *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005). The District Court's grant of summary judgment in favor of the appellees will be affirmed if it appears that "there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law." *Id.* (quoting *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 354 (3d Cir. 2003)). An issue is material if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In evaluating the evidence, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

---

[2]Kenneth Bornstad's appeals from the District Court's decision not to preclude Dr. G. John DiGregorio's opinion and to preclude in part the opinion of Dr. R. Paul McCauley are not addressed here because they are mooted by our conclusion that summary judgment was properly granted on the § 1983 claims.

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). However, "[i]n order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996); FED. R. CIV. P. 56(e).

## II.

On June 6, 2002, Keith Bornstad ("Bornstad") returned to the home that he shared with Lorraine Barlow and her seven year-old daughter, Jessica. Bornstad had been drinking and was intoxicated. Bornstad bit Barlow's daughter on the back and on the cheek. He then had a disagreement with Barlow and struck her in the face. Barlow called the 911 emergency number, but Bornstad thwarted her from speaking to the dispatcher. When the dispatcher called back, there was no answer. Officers Sasso and Baxter were summoned to the house to investigate the 911 hang-up at approximately 9:15pm. When the two officers arrived on the scene they were met at the door by Bornstad and they asked him about the 911 hang-up. He admitted that there had been a problem, but told them that it had passed. Barlow contradicted this statement. Officer Baxter walked with Bornstad out to the porch where he spoke to him while Officer Sasso spoke with Barlow and viewed the bite mark on Jessica's back. When Officer Sasso returned to Officer Baxter and Bornstad, he informed Bornstad that he was placing him under arrest.

5

Bornstad refused to submit to the officers' requests that he put his hands behind his back so that they could handcuff him. He swung his arms at the officers and hit one of them, eventually wrestling both to the ground. Barlow later stated that "[t]he only thing I observed was Keith started swinging first." Bornstad landed on the ground on his back. The officers sprayed him with pepper spray, but to no effect. He continued to thrash and flail his limbs at the officers, and was not compliant even after he had been handcuffed with his hands in front of his body. When Barlow came out of the house to see what was happening, the officers indicated to her that she should call 911 for backup. She later stated that while the first two officers were attempting to subdue Bornstad they pressed a knee into his chest. Bornstad was still on his back at the time. She also reported hearing Bornstad "yelling out for me for help ... [a]nd [saying that] he was having trouble breathing." She could not recall how long the struggle between the first two officers and Bornstad lasted.

When the backup officers arrived, they attempted to assist Officers Baxter and Sasso in holding Bornstad down. The group turned Bornstad over in order to handcuff him behind his back. Barlow later said that she did not see any of the backup officers on top of Bornstad, and that she never saw any of them hit him. The officers tied Bornstad's feet and attempted to move him to the police cruiser. At the point that they were loading him into the vehicle, one of the officers noticed that he was not breathing. They removed him from the vehicle and placed him on the ground. When Barlow came out of the house

one more time, she saw Bornstad motionless on the ground. The officers commenced CPR, the ambulance arrived, and Bornstad was transported to the hospital where he was pronounced dead.

An autopsy performed by Dr. Ian Hood indicated that the cause of death was compression asphyxia contributed to by arteriosclerotic coronary vascular disease. Prior to receiving the lab reports on the specimens he had sent for toxicological evaluation, he also opined that "a toxicological cause would best explain the described suddenness of the death." He later indicated surprise at the lack of substances other than alcohol in Bornstad's system, stating that "I was expecting because of his behavior – he sounded very much like cases that we encounter in Philadelphia, which turn out to have generally cocaine, but sometimes one of the other stimulants, as well, on board." In rendering his opinion, Dr. Hood relied upon his own examination, which revealed only superficial wounds, and his observation of Bornstad's brain, which was "notable for intense injection of meningeal vessels and a markedly 'dusky' purple-gray color," and the presence of petechiae around his eyelids, small dot-like hemorrhages that are seen in victims of strangulation and compression asphyxia. The report further explained that "[c]onsecutive coronal sections disclose a very hypoxic purple-gray color of the deep and cortical gray matter...." Dr. Hood also noted a 50-60 percent stenosis in the coronary arteries caused by scattered complex atheriosclerosis. However, Dr. Hood identified the primary cause of death as compression asphyxia, citing the coronary vascular disease as only a contributing

factor.

Dr. Rodger Rothenberger, the Chester County Coroner, issued a death certificate for Bornstad on September 6, 2002. He listed the immediate cause of death as compression asphyxia. No other underlying causes were listed on the certificate. Dr. Rothenberger later explained that he did not include the coronary vascular disease on Bornstad's death certificate because "I don't feel that the coronary vascular disease contributed or was a key factor resulting in his death [because] the ... disease was present but was not found to any significant degree."

The report from the toxicology lab indicated that Bornstad had a blood ethanol level of 0.099 percent wt./vol., and a urine ethanol level of 0.17 percent wt./vol. The lab also analyzed Bornstad's urine for various drugs, and found that it was negative for all substances, including benzodiazepines, barbiturates, cannabinoids, amphetamines, opiates, and cocaine. However, the lab's negative findings were accompanied by an indication that in fact there were very small units of some of the substances in Bornstad's urine sample.

III.

In reviewing a motion for summary judgment, district courts are obliged to view all facts in the light most favorable to the non-movant. *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 680 (3d Cir. 2003). Kenneth Bornstad asserts that the District Court failed to properly credit several contradictions in the evidence, most notably the

8

discrepancy between the police officers' testimony and the state forensic medical experts' testimony and findings. Kenneth Bornstad also claims that the District Court discounted the fact that the testimony of Lorraine Barlow and her friend, Angela Eckert, contradicted the officers' accounts, and the discrepancies in the officers' testimony.

In fact, in its recitation of the facts of the case, the District Court mentioned the primary circumstantial evidence submitted by the appellant only once, as confirmation of Bornstad's time of death. *See Bornstad ex rel. estate of Bornstad v. Honey Brook Twp.*, 2005 WL 2212359, at *5 (E.D. Pa. Sept. 9, 2005). Although the District Court discussed the medical opinions of Drs. Hood and Rothenberger in conjunction with its ruling on the admissibility of certain expert testimony, the District Court gave little indication that it considered their opinions as factual predicates for its ruling on summary judgment. In failing to consider the circumstantial medical evidence proffered by the plaintiff, the District Court did not clearly follow the established standard for summary judgment.

In the District Court's discussion of excessive force, it largely relegated the plaintiff's claim of compression asphyxia to a footnote, noting that "[p]laintiff primarily relies on three federal court of appeals decisions to argue that a court can declare [that] a Constitutional violation for excessive force obviously occurs where compression asphyxia occurs." *Bornstad*, 2005 WL 2212359, at *18 (internal quotation omitted). The Court dismissed Dr. Hood's conclusion that Bornstad died from compression asphyxia by stating that "[t]here is no evidence that the officers used any force at all *after* Bornstad

stopped resisting." *Id.*

Kenneth Bornstad argues that the District Court "simply accepted the gist of what most of the police officers claimed happened," and "ignored, or failed to analyze with any rigor, whatever evidence didn't match." It is true that the District Court opinion paid little attention to either the testimony of Barlow or the medical opinions of Drs. Hood and Rothenberger. However, the District Court's opinion closely tracks the opinion in *Tofano v. Reidel*, 61 F. Supp.2d 289 (D.N.J. 1999), which stated that "this court will assume that the positioning of the officers inhibited Tofano's breathing and, at least in part, caused his death. In other words, this court will assume that plaintiff's death resulted, at least in part, from positional asphyxiation...." *Id.* at 301. By way of comparison, the District Court here stated that "we will assume that the conduct of the Defendant officers inhibited Bornstad's ability to breathe and contributed to his death." *Bornstad*, 2005 WL 2212359, at *18. Following *Tofano*'s lead,[3] the District Court stated that "[t]his assumption does not alter the conclusion that the officers acted reasonably in attempting to subdue Bornstad." *Id.* Although a more thorough explanation of how the Court construed all the facts in the light most favorable to the plaintiff is desirable, this deference to the plaintiff's theory of the case fulfills the minimum requirements of Rule 56(c).

IV.

We will affirm the District Court's opinion with respect to the excessive force

---

[3]The decision in *Tofano* was not appealed, and has only been cited by five other district courts, including the District Court here.

claim. Although the defendant officers had probable cause for Bornstad's arrest, "the fact that the defendants had probable cause to arrest ... does not mean that they could use any amount of force in that process." *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003). In order to show excessive force, the plaintiff must demonstrate that the defendants' seizure of the plaintiff was unreasonable. *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). As established in *Graham v. Connor*, 490 U.S. 386 (1989), reasonableness is evaluated under a totality of the circumstances analysis, which asks whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Id.* at 397. At least three factors should be included in the reasonableness calculus: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The Third Circuit added some additional candidates for consideration in *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997):

> Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Id.* at 822. Under this rubric, the officers' actions here, although they had fatal consequences, were objectively reasonable.

The circumstance of Bornstad's arrest and demise was a confrontation between

11

police officers and an imposing, intoxicated suspect.[4] There is no dispute that Bornstad

himself quickly turned the encounter into a physical altercation. All three of the factors

outlined in *Graham* weigh in favor of the officers. First, Bornstad was suspected of

domestic violence that involved biting a child. This offense is serious. *Singer v. Court of

Common Pleas, Bucks County*, 879 F.2d 1203, 1206 (3d Cir. 1989). Second, by swinging

at the officers and wrestling them to the ground, he posed an immediate threat to the

safety of the officers and himself. Third, there is no question that he resisted arrest. From

the time Bornstad answered the door, all of his responses and actions were intended to

avoid arrest.

The other relevant factors listed by the *Sharrar* Court also favor the appellees.

Bornstad was certainly violent and likely dangerous. The length of the action appears to

have been substantial–the police were summoned around 9:15pm and the time of death

was pronounced at 11:35pm. The action took place entirely within the context of effecting

an arrest. Although no weapon was involved and the police essentially had to contend

only with Bornstad, the totality of the factors weighs in their favor. The principal factor

that does not is the fact of injury. As the Court in *Sharrar* pointed out, "the fact that the

physical force applied was of such an extent as to lead to injury is indeed a relevant factor

to be considered as part of the totality." 128 F.3d at 822. However, as accurately noted by

---

[4]The autopsy report noted that "[t]he body is that of a large, muscular, robust adult male ... [t]he body length approximates 6 feet 1 inch and the weight is estimated at about 230 pounds."

the Seventh Circuit, "the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment–a plaintiff must identify the *specific* unreasonable conduct that caused his or her injuries." *Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005) (emphasis added). Kenneth Bornstad identifies the cause of the injury as being the officers' inappropriate actions in kneeling on Bornstad, but offers only Barlow's later and enhanced testimony, and Angela Eckert's testimony as to Barlow's excited utterance, as evidence that this occurred.

In evaluating the totality of the circumstances, courts must also be mindful of the Supreme Court's admonition that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The undisputed circumstances here were that the officers were confronted with an uncooperative, intoxicated, and physically imposing individual suspected of domestic violence on a dark, rainy evening. The District Court properly considered the scene from the perspective of an officer responding to the dispatch to Bornstad's home.

In *Wagner v. Bay City, Texas*, 227 F.3d 316 (5th Cir. 2000), the Fifth Circuit was confronted with a factually similar situation. Gutierrez, the decedent, had caused a disturbance at a fast food restaurant and physically resisted arrest when two officers attempted to restrain him. *Id.* at 318-19. The officers removed him from the restaurant

13

and placed him face down on the pavement, where they handcuffed him. During that process, the officers used pepper spray and one of the officers put his shin across Gutierrez's back. A late-arriving officer reported that he saw two officers on top of Gutierrez. After taking Gutierrez to jail, the officers noticed that he was not breathing and began CPR. They took him to the hospital where he later died. *Id.* The trial court denied summary judgment for the two officers involved in the altercation in the restaurant.

The Fifth Circuit confirmed that "the district court correctly concluded that Wagner made a plausible argument that Gutierrez's injury directly and exclusively resulted from his altercation with defendants Hadash and Mirelez. A reasonable jury could conclude that the use of pepper spray, combined with the fact that the officers repeatedly pushed him face-first to the ground, could have resulted in Gutierrez's stopping breathing." *Id.* at 320. However, the Fifth Circuit reversed the denial of summary judgment on the grounds that the officers' conduct was objectively reasonable because "[t]he officers' actions were all consistent with the idea that they merely were trying to restrain a violent individual." *Id.* at 324. The same rationale applies here.

Although "officers–indeed, any reasonable person–should [know] that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable," see *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003), and *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), it is not so clearly unreasonable to exert severe force

14

on an individual who continues to violently resist arrest. Barlow's deposition testimony indicates that Bornstad continued to struggle with police even after he had been down on the ground and handcuffed. Moreover, she testified that she "saw them get on the back of him with the knee way because he had already fought with them. And I guess that would be irregular for a police officer to do. So they put his arms behind his back to handcuff him, *and he flung again*." (emphasis added). Given the resistance that Bornstad mounted throughout his arrest, it is impossible to compare, as the appellant wishes, the circumstances of his arrest with those in *Drummond* or *Champion*, in which the plaintiffs became compliant after they had been handcuffed and shackled. The officers were not required to treat the still-resisting Bornstad in the same manner as was required of the officers in either *Drummond* or *Champion*.

Furthermore, neither the decision to roll Bornstad over and handcuff him behind his back or the decision to bind his legs constituted objectively unreasonable force, and Kenneth Bornstad does not argue to the contrary. The struggle had escalated to the point where such restraints were appropriate, and Bornstad himself was the cause of the escalation. In *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), the Seventh Circuit addressed a situation in which the decedent actively resisted any attempts to subdue him. *Id.* at 593. The Court held that it was reasonable to maneuver a resisting individual into a prone position and to restrain his legs, "given the peril posed by his continued kicking." *Id.* Indeed, the Court noted that this response was appropriate in light

15

of the fact that "the struggle escalated, but the uncontroverted testimony is that Mr. Phillips' actions caused the escalation." *Id.* at 592. In a similar fashion, the uncontroverted testimony here is that Bornstad initiated the physical encounter and prompted a continued physical response by the officers by failing to submit to their authority. *See, e.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) ("Authorities must be allowed 'to graduate their response to the demands of any particular situation.'" (quoting *United States v. Place,* 462 U.S. 696, 709 n.10 (1983))). Consequently, and in consideration of all of the factors outlined in *Graham v. Connor* and its progeny, we conclude that the force exerted upon Bornstad was objectively reasonable. Accordingly, the officers did not violate Bornstad's Fourth Amendment right to be free from the use of excessive force.[5]

## V.

The appellant also disputes the District Court's ruling on his claim for failure to render necessary medical assistance. In particular, Kenneth Bornstad argues that "when a state officer's conduct places a person in peril in deliberate indifference to their safety, that conduct creates a constitutional claim." *Penilla v. City of Huntington Park*, 115 F.3d

---

[5]The District Court also concluded that the officers were entitled to qualified immunity. However, we need not reach this issue because we find no constitutional violation. Correspondingly, there is no need for immunity analysis. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (explaining that the initial inquiry in qualified immunity is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"); *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002) ("If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end....").

707, 709 (9th Cir. 1997). Kenneth Bornstad does not present any additional evidence in

support of this claim, except to note Barlow's statement that the officers were "watching

Keith die." This proffer is in stark contrast to that made in *Penilla*:

> The officers in this case allegedly took affirmative actions that significantly increased the risk facing Penilla: they cancelled the 911 call to the paramedics; they dragged Penilla from his porch, where he was in public view, into an empty house; they then locked the door and left him there alone. And they allegedly did so *after* they had examined him and found him to be in serious medical need.

*Id.* at 710. While there is no requirement that the appellant present evidence of the caliber

presented in *Penilla*, Kenneth Bornstad has not met his burden to supply sufficient

evidence that a jury could find in his favor as to this claim. *See Olson*, 101 F.3d at 951.[6]

VI.

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658

(1978), the Supreme Court explained that "[o]ur analysis of the legislative history of the

Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities

---

[6]It should also be noted that the District Court stated, in an alternative holding with respect to the medical assistance claim, that because the protections of the Due Process Clause of the Fourteenth Amendment only apply after the initial seizure is complete and the individual is in custody, Bornstad did not enjoy those protections at the time of his medical distress. The Court was probably incorrect in its assertion that "Plaintiff appears to concede that Bornstad was not in the custody of the Defendant officers prior to his death." *Bornstad*, 2005 WL 2212359, at *19. However, as this holding was an alternative to the Court's ruling that the claim should be dismissed because "there is no evidence that the Defendant officers exhibited deliberate indifference to a serious medical need of Bornstad," see *id.* at *20, there is no need to correct the District Court's misinterpretation of the plaintiff's argument.

and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690. Accordingly, Kenneth Bornstad argues that the District Court improperly granted summary judgment in favor of the townships on his claim that the townships failed to train the officers in preventing and avoiding compression asphyxia, thereby displaying a deliberate indifference to the constitutional rights of their citizenry. As a preliminary matter, "[a] finding of municipal liability does not depend automatically or necessarily on the liability of any police officer." *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994). "However, for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights." *Brown v. Comm., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003). Accordingly, as we have found that no violation of Bornstad's rights occurred here, we find no basis for municipal liability. The District Court properly granted summary judgment in favor of the townships.

VII.

The District Court's grant of summary judgment in favor of the defendants will be affirmed. Although the District Court does not seem to have followed precisely the requirement that it evaluate all of the evidence in favor of the plaintiff, a de novo review of the evidence presented reveals that the officers' actions were objectively reasonable in light of the situation they encountered. The District Court's grant of summary judgment to the townships on the municipal liability claims was likewise proper because the plaintiff

18

failed to come forward with anything more than bald assertions regarding a direct causal link between a township policy and the alleged constitutional violation. Accordingly, we will affirm the District Court's judgment.